# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO: 2004-12099GAO**

| | |
|---|---|
| SHERWIN COOPERSTEIN, by<br>ALICE COOPERSTEIN POA, and<br>ALICE COOPERSTEIN,<br>　　　Plaintiffs,<br><br>vs.<br><br>ROBERT DAVIS, M.D. and CAPE COD<br>HEALTHCARE, INC.,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS, ROBERT DAVIS, M.D. AND CAPE COD HEALTHCARE, INC.S DISCLOSURE OF EXPERT TESTIMONY PURSUANT TO FED. R. CIV. P. 26(a)(2)

The Defendants, Robert Davis, M.D. and Cape Cod Healthcare, Inc. (hereinafter collectively referred to as the "Defendants") make this disclosure of expert testimony in accordance with Fed. R. Civ. P. 26(a)(2) and Local Rule 26(a)(2).

1.　　**Richard Herman, M.D.**
　　　**Caritas Good Samaritan Medical Center**
　　　**Emergency Department**
　　　**235 North Pearl Street**
　　　**Brockton, Massachusetts 02301**

　　　A.　　Qualifications

　　　See Curriculum Vitae attached hereto as Exhibit "A".

　　　B.　　Opinion/Basis for Opinion Testimony

Dr. Herman is expected to testify that Dr. Robert Davis ("Dr. Davis") complied with the accepted standard of care of the average qualified emergency physician in his medical management of Dr. Sherwin Cooperstein in June 2003. Dr. Herman will testify with a reasonable degree of medical certainty that nothing Dr. Davis did or failed to do contributed to Dr. Cooperstein's subsequent disability or death. Dr. Herman will testify regarding his training and experience in order to establish his familiarity with the standards of care, which apply to the facts of this case.

Dr. Herman is expected to testify at trial based upon his review of Dr. Sherwin Cooperstein's medical records, death certificate, deposition transcripts, other discovery in this litigation and evidence and testimony adduced at trial. In so testifying, Dr. Herman will rely upon his education, training and experience at the time of trial.

It is expected that Dr. Herman will testify specifically about Dr. Cooperstein's significant deteriorating physical and mental history, prior to arriving in the Falmouth Hospital Emergency Room on June 22, 2003 (including the specific details of his Parkinson's Disease with Lewy Body Dementia, atrial fibrillation with permanent pacemaker, CAD status post coronary bypass graft surgery, hypertension, elevated cholesterol, aortic valve replacement, glaucoma, macular degeneration, and hearing impairment) and the significance of the same to his medical course and outcome. Specifically, Dr. Cooperstein had progressively worsening Lewy Body Dementia since 1998. His symptoms had been escalating in the months prior to his being seen in the Emergency Room in June 2003. Further, that the disease has an average course of five to seven years.

Dr. Herman is expected to testify specifically regarding Dr. Cooperstein's Falmouth Hospital Emergency Room visit on June 22, 2003, including, reviewing in detail the medical records, discussing the details and significance of the same, and to opine that Dr. Davis met the standard of care. Specifically, it is expected that Dr. Herman will testify that Dr. Davis' initial care and treatment, which included, taking the patient's history, ordering IV fluids, ordering labs collected, and then providing immediate treatment to the nosebleed (clearing the clots, applying topical cocaine, and inserting a Rhino Rocket in the patient's nose) was appropriate. The patient's initial labs reported back within normal limits (hematocrit 40 and hemoglobin 13.3). The patient's INR of 2.3 was sub-therapeutic. Dr. Davis appropriately called Cape Cod Hospital to consult with ear, nose and throat physician, Dr. Bruce Gordon, regarding the patient's medical history, current condition, and treatment plan. They decided that the patient was stable enough to remain at Falmouth Hospital. Dr. Davis then appropriately called hospitalist, Dr. Walter Ryan, to discuss the patient's condition and treatment plan. Both agreed that the patient's condition was stable and the decision was made to admit the patient.

It is further expected that Dr. Herman will testify that at 8:00 p.m. the patient had a brief 10-minute drop in blood pressure (going from an initial blood pressure on arrival of 150/102 to 82/52), with reports of being pale, diaphoretic and hypotensive, awake and alert. The patient was then moved to another room in the Emergency Room. At 8:10 p.m. his blood pressure returned to 109/65. The patient was awake and alert. The patent denied pain and shortness of breath. A second IV bolus was appropriately started.

At 8:40 p.m. the patient had a second drop in blood pressure to 84/53. At 9:05 p.m. the patient complains of feeling hot and is becoming diaphoretic, but he denies chest pain or shortness of breath. Dr. Herman is expected to testify that Dr. Davis' response to this hypotensive episode is entirely appropriate. The treatment interventions included monitoring, IV fluids, lowering the head of the patient's bed; drawing the type and screen of blood (in anticipation of ordering fresh frozen plasma); moving the patient to room 7, a more closely

monitored room; continued the patient's IV fluids; and ordering vitamin K and Sinemet to address the patient's Parkinson's.

Dr. Herman is expected to testify that Dr. Ryan was in to see the patient at 9:35 p.m. The patient was alert. There is no note of any mental status changes or significant bleed. Dr. Ryan called for a cardiology consultation with Dr. Kasha Moskel, but otherwise made no changes in the medical care that was being ordered. The patient continued to receive IV fluids. Dr. Davis' last involvement with this patient was at 9:50 p.m.

Dr. Herman is further expected to testify concerning the amount of IV fluids administered to Dr. Cooperstein. Dr. Herman will testify that an appropriate amount of fluid was given to this patient while he was in the Emergency Room. An initial IV of 500 cc's was started upon the patient's admission at 7:00 p.m. This was increased another 500 cc's at 8:10 p.m. Additionally, at 9:10 p.m. type and screen were drawn and sent with the intent of obtaining fresh frozen plasma. At 9:15 p.m. a new IV was started in the opposite left forearm. Dr. Herman will testify that Dr. Davis appropriately continued to hydrate Dr. Cooperstein throughout his entire stay in the emergency room. Furthermore, the Brigham and Women's Hospital records indicate that while Dr. Cooperstein was at Falmouth Hospital he received 1200 cc's of IV fluid and 400 cc's of fresh frozen plasma. Dr. Herman is expected to testify that the hydration administered by Dr. Davis was more than adequate, and that it would have been quite risky to treat Dr. Cooperstein with large amounts of crystalloid or blood, considering his tenuous cardiac status.

It is expected that Dr. Herman will testify that Dr. Cooperstein's relative hypotension most likely was a vasovagal response to nasal packing or autonomic instability secondary to his Lewy Body Dementia.

Dr. Herman is further expected to testify that the blood work was within normal limits and there was no indication of excessive blood loss or hemorrhaging. Severe blood loss is manifested by a change in vital signs. The first indication of moderate volume depletion, from any cause, is a rising pulse. Dr. Herman will testify that on arrival in the Emergency Room, Dr. Cooperstein did not have an elevated heart rate. (In this case, the absence of tachycardia makes the diagnosis of a vasovagal response more likely than blood loss or volume depletion. With severe volume depletion or blood loss, a fall in blood pressure is a later finding). The patient's heart rate remained stable from 8:40 to 9:35 p.m. This is evidence that the patient was not hypotensive caused by any great loss of blood because if there was excessive blood loss then he would have expected the patient's heart rate to rise, which it did not in this case.

Accordingly, Dr. Herman is expected to testify that at all times Dr. Davis acted appropriately and in accordance with the standard of care of the average qualified emergency physician in his evaluation and treatment of Dr. Cooperstein on June 22, 2003.

C.    Exhibits in Support of Opinion

The exhibits pertaining to Dr. Herman's opinions include, Dr. Sherwin Cooperstein's medical records from Falmouth Hospital, Brigham & Women's Hospital, the keeper of the

records from health care providers exchanged between the parties during discovery, death certificate, deposition transcripts, and other discovery in this litigation.

      D.     Publications Authored (within preceding ten years)

See Curriculum Vitae attached hereto as Exhibit "A".

      E.     Compensation to be Paid for Study/Testimony

Dr. Herman will be paid $375.00 per hour for his review of materials, and for his deposition and trial testimony.

      F.     Prior Trial and/or Deposition Testimony (within last four years)

William Griffin v. Andrew J. Deane, M.D.
Middlesex Superior Court; Civil Action No. 2002-02079-H
Trial Date: March 3, 2006

Estate of Eleanor Joffre v. Johnye Supulski, M.D.
New Hampshire
Deposition Date: August 31, 2004

Joseph Sattler, as Administrator of the Estate of Doris Lander v. Wild Acre Inns, Inc.
Essex Superior Court; Civil Action No. 2000-911-C
Trial Date: August 5, 2004

John Johnston v. Ben Cippiloni
Suffolk Superior Court; Civil Action No. 1997-4068
Trial Date: June 7, 2004

Mark S. Keiler v. Harlow LaBarge
Essex Superior Court; Civil Action No. 1999-01250-C
Trial Date: October 29, 2003

Richard Ferland v. Ricardo Gervasio, M.D.
Essex Superior Court; Civil Action No. 2000-00762
Trial Date: September 29, 2003

Estate of Ethan Dias v. David Fuerman, D.O.
Bristol Superior Court; Civil Action No. 1998-00637
Trial Date: September 15, 2003

Diana O'Keefe (Stephen Dunn) v. Antonio Dajer, M.D.
Norfolk Superior Court; Civil Action No. 1998-01853
Trial Date: March 24, 2003

Evelyn M. Ferreira v. James Lewis, P.A.
Bristol Superior Court; Civil Action No. 1999-01093
Trial Date: February 11, 2003

Kathleen Mahoney v. Clarence Brown, M.D.
Middlesex Superior Court; Civil Action No. 1998-6050A
Trial Date:  October 13, 2002

**2.     William R. Mason, M.D.**
**Faulkner Hospital**
**1153 Centre Street, Suite 52**
**Boston, Massachusetts 02130**

A.      <u>Qualifications</u>

See Curriculum Vitae attached hereto as Exhibit "B".

B.      <u>Opinion/Basis for Opinion</u>

Dr. Mason is expected to testify that Dr. Davis complied with the accepted standard of care of the average qualified emergency physician in his medical management of Dr. Sherwin Cooperstein in June 2003.  Dr. Mason will testify with a reasonable degree of medical certainty that nothing Dr. Davis did or failed to do contributed to Dr. Cooperstein's subsequent disability or death.  Dr. Mason will testify regarding his training and experience in order to establish his familiarity with the standards of care, which apply to the facts of this case.

Dr. Mason is expected to testify at trial based upon his review of Dr. Sherwin Cooperstein's medical records, death certificate, deposition transcripts, other discovery in this litigation and evidence and testimony adduced at trial.  In so testifying, Dr. Mason will rely upon his education, training and experience at the time of trial.

It is expected that Dr. Mason will testify specifically about Dr. Cooperstein's significant deteriorating physical and mental history, prior to arriving in the Falmouth Hospital Emergency Room on June 22, 2003 (including the specific details of his Parkinson's Disease with Lewy Body Dementia, atrial fibrillation with permanent pacemaker, CAD status post coronary bypass graft surgery, hypertension, elevated cholesterol, aortic valve replacement, glaucoma, macular degeneration, and hearing impairment) and the significance of the same to his medical course and outcome.

Dr. Mason is expected to testify specifically regarding Dr. Cooperstein's Falmouth Hospital Emergency Room visit on June 22, 2003, including, reviewing in detail the medical records, discussing the details and significance of the same, and to opine that Dr. Davis met the standard of care.  Specifically, it is expected that Dr. Mason will testify that Dr. Davis' initial care and treatment, which included, taking the patient's history, ordering IV fluids, ordering labs collected, and then providing immediate treatment to the nosebleed (clearing the clots, applying topical cocaine, and inserting a Rhino Rocket in the patient's nose) was appropriate.  The

patient's initial labs reported back within normal limits (hematocrit 40 and hemoglobin 13.3). The patient's INR of 2.3 was sub-therapeutic. Dr. Davis appropriately called Cape Cod Hospital to consult with ear, nose and throat physician, Dr. Bruce Gordon, regarding the patient's medical history, current condition, and treatment plan. They decided that the patient was stable enough to remain at Falmouth Hospital. Dr. Davis then appropriately called hospitalist, Dr. Walter Ryan, to discuss the patient's condition and treatment plan. Both agreed that the patient's condition was stable and the decision was made to admit the patient.

It is further expected that Dr. Mason will testify that at 8:00 p.m. the patient had a brief 10-minute drop in blood pressure (going from an initial blood pressure on arrival of 150/102 to 82/52), with reports of being pale, diaphoretic and hypotensive, awake and alert. The patient was then moved to another room in the Emergency Room. At 8:10 p.m. his blood pressure returned to 109/65. The patient was awake and alert. The patent denied pain and shortness of breath. A second IV bolus was appropriately started.

At 8:40 p.m. the patient had a second drop in blood pressure to 84/53. At 9:05 p.m. the patient complains of feeling hot and is becoming diaphoretic, but he denies chest pain or shortness of breath. Dr. Mason is expected to testify that Dr. Davis' response to this hypotensive episode is entirely appropriate. The treatment interventions included, monitoring IV fluids, lowering the head of the patient's bed; drawing the type and screen of blood (in anticipation of ordering fresh frozen plasma); moving the patient to room 7, a more closely monitored room; continuing the patient's IV fluids; and ordering vitamin K and Sinemet to address the patient's Parkinson's.

Dr. Mason is expected to testify that Dr. Ryan was in to see the patient at 9:35 p.m. The patient was alert. There is no note of any mental status changes or significant bleed. Dr. Ryan called for a cardiology consultation with Dr. Kasha Moskel, but otherwise made no changes in the medical care that was being ordered. The patient continued to receive IV fluids. Dr. Davis' last involvement with this patient was at 9:50 p.m.

Dr. Mason is further expected to testify concerning the amount of IV fluids administered to Dr. Cooperstein. Dr. Mason will testify that an appropriate amount of fluid was given to this patient while he was in the Emergency Room. An initial IV of 500 cc's was started upon the patient's admission at 7:00 p.m. This was increased another 500 cc's at 8:10 p.m. Additionally, at 9:10 p.m. type and screen were drawn and sent with the intent of obtaining fresh frozen plasma. At 9:15 p.m. a new IV was started in the opposite left forearm. Dr. Mason will testify that Dr. Davis appropriately continued to hydrate Dr. Cooperstein throughout his entire stay in the Emergency Room. Furthermore, the Brigham and Women's Hospital records indicate that while Dr. Cooperstein was at Falmouth Hospital he received 1200 cc's of IV fluid and 400 cc's of fresh frozen plasma. Dr. Mason is expected to testify that the hydration administered by Dr. Davis was more than adequate, and that it would have been quite risky to treat Dr. Cooperstein with large amounts of crystalloid or blood, considering his tenuous cardiac status.

It is expected that Dr. Mason will testify that Dr. Cooperstein's relative hypotension most likely was a vasovagal response to nasal packing or autonomic instability secondary to his Lewy Body Dementia.

6

Dr. Mason is further expected to testify that the blood work was within normal limits and there was no indication of excessive blood loss or hemorrhaging. Severe blood loss is manifested by a change in vital signs. The first indication of moderate volume depletion, from any cause, is a rising pulse. Dr. Mason will testify that on arrival in the Emergency Room, Dr. Cooperstein did not have an elevated heart rate. (In this case, the absence of tachycardia makes the diagnosis of a vasovagal response more likely than blood loss or volume depletion. With severe volume depletion or blood loss, a fall in blood pressure is a later finding). The patient's heart rate remained stable from 8:40 to 9:35 p.m. This is evidence that the patient was not hypotensive caused by any great loss of blood because if there was excessive blood loss then he would have expected the patient's heart rate to rise, which it did not in this case.

Accordingly, Dr. Mason is expected to testify that at all times Dr. Davis acted appropriately and in accordance with the standard of care of the average qualified emergency physician in his evaluation and treatment of Dr. Cooperstein on June 22, 2003.

C.    <u>Exhibits in Support of Opinion</u>

The exhibits pertaining to Dr. Mason's opinions include, Dr. Sherwin Cooperstein's medical records from Falmouth Hospital, Brigham & Women's Hospital, the keeper of the records from health care providers exchanged between the parties during discovery, death certificate, deposition transcripts, and other discovery in this litigation.

D.    <u>Publications Authored (within preceding ten years)</u>

See Curriculum Vitae attached hereto as Exhibit "B".

E.    <u>Compensation to be Paid for Study/Testimony</u>

Dr. Mason will be paid $400.00 per hour for his review of materials and for trial testimony, and $700 per hour for his deposition testimony.

F.    <u>Prior Trial and/or Deposition Testimony (within last four years)</u>

Rosenfield v. Irafrati
Trial Date: December 2002

Plourde v. Graveline
Deposition Date: August 2003

Craven v. Randolph
Deposition Date: October 30, 2003

Burgess v. Asher
Trial Date: June 17, 2004

Shute v. Friedensohn
Trial Date: February 7, 2005

Wright v. Regala
Trial Date: May 15, 2006

Tyber v. Langston
Trial Date: January 2006

Rudychenko v. Dorman
Florida
Deposition Date: July 10, 2006

**3.     Joseph Gerald D'Alton, M.D.**
**463 Worcester Road, STE 101**
**Framingham, MA 01701**

A.     <u>Qualifications</u>

See Curriculum Vitae attached hereto as Exhibit "C".

B.     <u>Opinion/Basis for Opinion</u>

Dr. D'Alton is expected to testify with a reasonable degree of medical certainty that nothing Dr. Davis did or failed to do in June 2003 contributed to Dr. Sherwin Cooperstein's subsequent disability or death. Dr. D'Alton will testify regarding his training and experience in order to establish his familiarity with the causal connection, which applies to the facts of this case.

Dr. D'Alton is expected to testify at trial based upon his review of Dr. Sherwin Cooperstein's medical records, death certificate, deposition transcripts, other discovery in this litigation and evidence and testimony adduced at trial. In so testifying, Dr. D'Alton will rely upon his education, training and experience at the time of trial.

It is expected that Dr. D'Alton will testify specifically about Dr. Cooperstein's significant deteriorating physical and mental history, prior to arriving in the Falmouth Hospital Emergency Room on June 22, 2003 (including the specific details of his Parkinson's Disease with Lewy Body Dementia, atrial fibrillation with permanent pacemaker, CAD status post coronary bypass graft surgery, hypertension, elevated cholesterol, aortic valve replacement, glaucoma, macular degeneration, and hearing impairment) and the significance of the same to his medical course and outcome. Specifically, Dr. Cooperstein had progressively worsening Lewy Body Dementia since 1998. His symptoms had been escalating in the months prior to his being seen in the Emergency Room in June 2003. Further, that the disease has an average course of five to seven years.

Dr. D'Alton is expected to testify specifically regarding Dr. Cooperstein's Falmouth Hospital Emergency Room visit on June 22, 2003, including, reviewing in detail the medical records, discussing the details and significance of the same, and to opine that nothing Dr. Davis did or failed to do caused Dr. Cooperstein's subsequent disability or death. Specifically, Dr. Dalton will testify that during the alleged period of hypotension Dr. Cooperstein did not exhibit any symptoms of neurologic injury; rather, the records indicate that the patient was awake and alert, talking to the nurse, and denied chest pain and shortness of breath.

Dr. D'Alton is expected to testify that upon admission to Falmouth Hospital on June 22, 2003, Dr. Cooperstein had a pre-existing severe neurological disease, manifest by Parkinsonism and Dementia. He had been diagnosed as having Lewy Body Disease and he had undergone a rapid progression, with clinical deterioration in the preceding eight months. During this time, Dr. Cooperstein had exhibited increasing memory impairment, inability to read, difficulty speaking, and problems with activities of daily living. He had episodic visual hallucinations. As is typical with Lewy Body Disease, symptoms fluctuated throughout the day, and from day to day, but with a clear progressive overall trend.

Dr. D'Alton is expected to testify, in general, concerning Lewy Body Disease and Dementia, its symptoms, progression, and impact. Specifically, that people with Dementia are more susceptible to confusion and deterioration when exposed to external stressors, such as removal from familiar surroundings, mechanical ventilation and sedation.

It is expected that Dr. D'Alton will testify that at the time of Dr. Cooperstein's visit to the Falmouth Hospital Emergency Room on June 22, 2003, because of his underlying neurological disease, age, and multiple medical problems, Dr. Cooperstein was on the verge of not being able to live independently and he clearly had a reduced life expectancy.

Dr. D'Alton is further expected to testify that during Dr. Cooperstein's admission to the Falmouth Hospital Emergency Room on June 22, 2003, Dr. Cooperstein did not exhibit any symptoms or signs of neurologic dysfunction secondary to hypovolemia. If neurologic symptoms were to develop, they would occur during the period of alleged hypotension. However, the records clearly document that confusion and agitation did not occur until resolution of the alleged hypotension. Despite hypotension, there was not a concomitant rise in the pulse rate, as expected in hypovolemia. Dr. D'Alton will testify that this strongly supports that the mechanism of hypotension was not hypovolemia, but was more likely a vasovagal reaction. Furthermore, the Brigham and Woman's Hospital records indicate that after cessation of sedation and mechanical ventilation, Dr. Cooperstein's mental status gradually improved and was almost at base line prior to discharge. Accordingly, it is expected that Dr. D'Alton will testify that Dr. Cooperstein's relative hypotension most likely was a vasovagal response to nasal packing or autonomic instability secondary to his Lewy Body Dementia.

It is expected that Dr. D'Alton will testify that Dr. Cooperstein's subsequent clinical course at the JML Care Center was typical of patients with Lewy Body Dementia. He had fluctuating confusion and difficulty walking. Overall, Dr. Cooperstein had a gradually progressive decline, until his inevitable demise in November 2004. No autopsy was performed.

Accordingly, Dr. D'Alton is expected to testify that this clinical course was caused by Dr. Cooperstein's underlying brain disease, and that nothing Dr. Davis did or failed to do in June 2003, contributed to Dr. Sherwin Cooperstein's subsequent disability or death.

C.    Exhibits in Support of Opinion

The exhibits pertaining to Dr. D'Alton's opinions include, Dr. Sherwin Cooperstein's medical records from Falmouth Hospital, Brigham & Women's Hospital, the keeper of the records from health care providers exchanged between the parties during discovery, death certificate, deposition transcripts, and other discovery in this litigation.

D.    Publications Authored (within preceding ten years)

See Curriculum Vitae attached hereto as Exhibit "C".

E.    Compensation to be Paid for Study/Testimony

Dr. D'Alton will be paid $400.00 per hour for his review of materials and for his deposition testimony, and $600.00 per hour for his trial testimony.

F.    Prior Trial and/or Deposition Testimony (within last four years)

Bradshaw v. Conrad ITT
Deposition Date:  August 2006

Robert v. Alamo Rent-a-Car
Deposition Date:  June 2006

Condrate v. Waste Management
Deposition Date: May 2005

Chicoine v. Fletcher Allen Healthcare
Deposition Date:  May 2005

Kanik v. Delisio
Deposition Date:  October 2003

Rossi v. Alexander
Springfield Superior Court
Trial Date:  August 2006

Robert v. Alamo Rent-a-Car
Middlesex Superior Court
Trial Date:  August 2006

McCamy v. Babineau
Worcester Superior Court
Deposition Date: July 2006

Lafortune v. Travers
Salem Superior Court
Trial Date: June 2006

Caira v. Tils
Middlesex Superior Court
Trial Date: May 2006

Thierault v. Dean
Springfield Superior Court
Trial Date: May 2006

Balcaitiene v. Skabeikis
Suffolk Superior Court
Trial Date: April 2006

Caputo v. Deangeles
Worcester Superior Court
Trial Date: February 2006

Christodopoulos v. Saeed, M.D.
Newburyport Superior Court
Trial Date: December 2005

Doucette v. Panera
United States District Court for the District of Massachusetts
Trial Date: October 2005

Molle v. Bass, M.D.
Middlesex Superior Court
Trial Date: September 2005

Farrinacci v. Ashenfelter
Norfolk Superior Court
Trial Date: June 2005

Prime v. Iovino, M.D.
Brockton Superior Court
Trial Date: February 2005

Mello v. Atria, Inc.
Norfolk Superior Court
Trial Date:  February 2005

Padgett v. Chin, M.D.
Berkshire Superior Court
Trial Date:  May 2004

King v. Steinbok, M.D.
Suffolk Superior Court
Trial Date:  September 2003

Rowland v. Sigsbee, M.D.
Barnstable Superior Court
Trial Date:  May 2003

Caputo v. Deangeles
Westborough District Court
Trial Date:  September 2002

Hamel v. Jaffe, M.D.
Springfield Superior Court
Trial Date:  June 2002

Fitzgerald v. Kazes, M.D.
Lawrence Superior Court
Trial Date:  May 2002

Osmani v. Ladd, M.D.
Quincy District Court
Trial Date:  March 2002

The defendants reserve the right to supplement this list prior to trial.

Respectfully submitted,

The Defendants,
ROBERT DAVIS, M.D. and
CAPE COD HEALTHCARE, INC.,

Dated: September 12, 2006

*Tanya K. Oldenhoff*
Edward T. Hinchey, BBO #235090
Tanya K. Oldenhoff, BBO #651006
Sloane and Walsh, LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-6010

## CERTIFICATE OF SERVICE

I, Tanya K. Oldenhoff, hereby certify that on September 12, 2006 I served a true copy of

the foregoing document on all parties or counsel of record, by first class mail, postage prepaid,

to:

FOR THE PLAINTIFFS
Gerald S. Sack, Esq.
Law Offices of Gerald S. Sack
836 Farmington Avenue, Suite 109
West Hartford, CT 06119
Email: gssack@sacklawoffice.com

*Tanya K. Oldenhoff*
Tanya K. Oldenhoff

S:\COOPERSTEIN, SHERWIN V. CAPE COD HEALTH CARE - CH-866-9069\Pleadings\Discovery\Disclosure of Expert Testimony 9-12-06.doc

# EXHIBIT A

**CURRICULUM VITAE**
**Richard S. Herman, MD, FACEP**
**Brockton Hospital Department of Emergency Medicine**
**680 Centre Street**
**Brockton, MA 02302**
**(508) 941-7193**
**rherman@brocktonhospital.org**

Born:   Hartford, CT
Family:   Married to Evelyn Dillard Herman; son Noah Joseph Herman

Certification and Licensure:
 Diplomate, American Board of Emergency Medicine, 1985 (re-certified 1995 and 2005)
 Diplomate, American Board of Internal Medicine, 1980
 Commonwealth of Massachusetts, License 44881

Education:
 Tufts University School of Medicine, M.D., 1977
 Fondation Curie - Institut du Radium, Paris, France, Rothschild Foundation Fellowship, 1972-1973
 Tufts College, Medford, MA; B.S. *summa cum laude*, 1972
 Conard High School, West Hartford, CT; first-in-class, 1969

Honorary Society:
 Phi Beta Kappa Society, 1972 (Tufts University)

Post-Graduate Training:
 Resident in Internal Medicine, Saint Elizabeth's Hospital; Boston, MA, 1978-80
 Intern in Internal Medicine, Saint Elizabeth's Hospital; Boston, MA, 1977-78

Practice Experience:
 Chief, Department of Emergency Services, Brockton Hospital, 1987-present; (Tufts New England Medical
  Center-affiliated community teaching hospital; 60,000 emergency visits per year)
 Assistant Chief, Department of Emergency Services, Brockton Hospital, 1983-87
 Emergency Physician, Brockton Hospital; 1980 to present

Professional Societies:
 American College of Emergency Physicians (ACEP), Fellow
 Massachusetts College of Emergency Physicians (MACEP)
 Society for Academic Emergency Medicine
 Massachusetts Medical Society (member, Committee on Accreditation Review, 2005-present)
 National Association of Medical Communicators, charter member
 Epilepsy Foundation of Massachusetts and Rhode Island, member of Medical Advisory Board (1998-2004)

Teaching:
 Affiliate Coordinator, Beth Israel Deaconess Harvard Affiliated Emergency Medicine Residency, 2005-6
 Clinical Assistant Professor of Medicine, Boston University School of Medicine, 1985-2005
 Instructor, Department of Community Health, Tufts University School of Medicine

Awards:
 1993 Certificate of Appreciation, American College of Emergency Physicians
 1992 Certificate of Appreciation, American College of Emergency Physicians
 1991 Certificate of Appreciation, American College of Emergency Physicians
 1990 Certificate of Appreciation, American College of Emergency Physicians
 1986 American College of Emergency Physicians National Chapter Project Award; Video documentary:
  "Emergency Medicine: The Newest Specialty"
 1980 Citation for Teaching Excellence, Tufts University School of Medicine

Publications:

*foresight*, Issue 24, October 1992, "Selected Pediatric Emergencies," editor
*foresight*, Issue 23, July 1992, "Prehospital Care," editor
*foresight*, Issue 22, April 1992, "The Pregnant Patient," editor
*foresight*, Issue 21, January 1992, "Patient Transfer Update: Part II," editor
*foresight*, Issue 20, October 1991, "Patient Transfer Update: Part I," editor
*foresight*, Issue 19, July 91, "Chest Pain Revisited," editor
*foresight*, Issue 18, April 1991, "Toxic Ingestions," editor
*foresight*, Issue 17, January 1991, "Child Abuse," editor
*foresight*, Issue 16, September 1990, "Complications of Wound Management," editor
*foresight*, Issue 15, June 1990, "Physician-Physician Relations," editor
*foresight*, Issue 14, March 1990, "House Staff in the Emergency Department," editor
*foresight*, Issue 13, December 1989, "Seizures," editor
*foresight*, Issue 12, September 1989, "The Patient with Altered Level of Consciousness," consulting reviewer
Herman, RS, "Nonvenomous Snakebite," Ann Emer Med, 1988, 17:1262-3
Herman, RS, "Video Epilepsy," Ann Emer Med, 1983, 12:516-7
Sekar, TS, et al, "Survival After Prolonged Submersion in Cold Water Without Neurological Sequelae," Arch Int
        Med, 1980, 140:775-9
Herman, RS, Rebeyrotte, N, "Study of X-Irradiated DNA," Biochem Biophys Research Comm, 1973, 55:150-3

Media and Public Relations:

Health and Medical Editor, CBS Radio (WBCN-FM Boston, MA); 1983-2004
Medical Reporter, New England Patriots Football Radio Network; 1995-present

American College of Emergency Physicians Activities:

ACEP Council, member, 1993-1997
Member, Emergency Medicine Practice Committee, 1993-4
Chairman, Quality of Care Committee, 1992-3
Chairman, *foresight* Editorial Panel (ACEP's quarterly Risk Management publication) 1989-1992

Massachusetts College of Emergency Physicians Activities:

Immediate Past President, 1997-8
President, 1996-7 (President-elect, 1995-6; Secretary, 1994-5; Treasurer, 1993-4)
Board of Directors, member 1988-1998
Chairman, Membership Services Committee, 1989-93
Moderator, Emergency Department Directors' Round Table, 1991-5

Brockton Hospital Activities:

Director of Medical Education
Committee on Continuing Medical Education, Chairman
Disaster Committee, Chairman
Medical Executive Committee, member
Stroke Committee, Chairman

Research

Principal Investigator, "National Study on Costs and Outcomes of Trauma Care" (NSCOT)
Principal Investigator, "Glucose-Insulin-Potassium Immediate Myocardial Metabolic Enhancement during Initial
        Assessment and Treatment in Emergency Care" (IMMEDIATE)
Principal Investigator, "EMS-Based TIPI-IS Cardiac care QI/Error Reduction System"

Public and Community Service

Member, Health and Medical Review Panel, Massachusetts Department of Correction Advisory Council, 2005
Member, City of Brockton Local Emergency Planning Council
Medical Director, AED Program for City of Brockton and Town of East Bridgewater public school systems
Medical Director, EMS Fire services for MA towns of Bridgewater, East Bridgewater, Whitman, Randolph, Hanson

July 14, 2006

# EXHIBIT B

**R.WILLIAM MASON, M.D.**

**15 OAK STREET**
**NEEDHAM, MA 02492**
**(781) 444-4722**

## Curriculum Vitae

April 2006

| | | |
|---|---|---|
| Home address: | 40 Woods End Road<br>Dedham, MA 02026 | |
| Office address: | 15 Oak Street<br>Needham, MA 02492 | |
| | Faulkner Hospital<br>1153 Centre Street<br>Suite 52<br>Boston, MA 02130 | |
| Date of Birth: | December 25, 1945 | |
| Place of Birth: | Philadelphia, PA | |
| Citizenship: | US | |
| Marital Status: | Married- Shelley Mason | 2 Children-Adam and Jennifer |
| Education: | Syracuse University- Bachelor of Arts | 1964-1968 |
| | New York University School of Medicine | 1968-1972 |
| Internship: | Medical Internship<br>Jackson Memorial Hospital<br>Miami, Florida | 1972-1973 |
| Residency: | General Surgery Residency<br>Mount Sinai Hospital<br>Miami, Florida | 1973-1974 |
| | Otolaryngology Residency<br>Boston University<br>Boston, Massachusetts | 1974-1977 |
| Licensure: | Massachusetts | 1974 |
| Specialty Certification: | American Board of Otolaryngology | 1977 |
| Practice: | 15 Oak Street, Needham MA | 1977-present |
| | Faulkner Hospital | 1985-present |

**Page 2**          **Curriculum Vitae**          **R. William Mason, M.D.**

Administrative:          President-Medical Staff-Faulkner Hospital

Chief-Department of Otolaryngology-Faulkner Hospital

Chief-Department of Otolaryngology-Deaconess Glover Hospital

Chairman-Quality Assurance Committee-Faulkner Hospital

Trustee-Brigham and Women's/Faulkner Hospital

Hospital affiliations:

| | | |
|---|---|---|
| Brigham and Women's/Faulkner Hospital | | Active Surgical Staff |
| Deaconess Glover Hospital | | Active Surgical Staff |
| Newton Wellesley Hospital | | Consulting Staff |
| Mass Eye and Ear Infirmary | | Consulting Staff |

Academic Appointments:          Associate Clinical Professor
Boston University School of Medicine

Clinical Instructor
Tufts University School of Medicine

Teaching Responsibilities:          Clinical Preceptor- Monthly- Brigham and Women's Medical Residency

Clinical Instructor- Weekly- Tufts Medical School-Third year Surgical Rotation

Lecturer- Harvard Medical School-  PRIMED Conference
Chicago, IL; Long Beach, CA

Lecturer- Harvard Medical School- Office Practice of Primary Care Conference
Boston, MA

Professional Societies:

| | | |
|---|---|---|
| Diplomate | American Board of Otolaryngology | 1977 |
| Fellow | American Academy of Otolaryngology | 1978 |
| Fellow | American College of Surgeons | 1987 |

American Medical Association

Massachusetts Medical Society

Massachusetts Otolaryngologic Society

New England Otologic Society

Interests:          Aviation (licensed pilot), Sculling, Sailing, Photography

# EXHIBIT C

## CURRICULUM VITAE
January 2006

### JOSEPH GERARD D'ALTON, M.D.

| | |
|---|---|
| Office Address: | 463 Worcester Road<br>Framingham, MA 01701 |
| Date of Birth: | July 4, 1951 |
| Marital Status: | Married, 3 children |
| Birthplace: | Ireland |

## EDUCATION:

| | |
|---|---|
| 1963-68 | High School, St. Mary's College,<br>Galway, Ireland |
| 1968-74 | Medical School, National University of Ireland,<br>University College, Galway, Ireland.<br>Graduated 1st in a class of 70.<br>Awarded gold medals in Surgery & Obstetrics. |
| 1974-77 | Internship and Residency in Internal Medicine,<br>University Hospital, Galway. |
| 1977-78 | Resident in Internal Medicine, University of Ottawa,<br>Canada. |
| 1978-81 | Resident in Neurology, University of Ottawa. |
| 1981-82 | Maclachlan Cerebrovascular Research<br>Fellow, Sunnybrook Medical Centre,<br>University of Toronto, Toronto |
| 1982-83 | Cerebrovascular Research Fellow,<br>Cerebral Blood Flow and Metabolism<br>Laboratory, Massachusetts General Hospital, Boston.<br><br>Research Fellow in Neurology, Harvard Medical School. |
| 1983-88 | Staff Neurologist Civic Hospital, Ottawa.<br><br>Director, Noninvasive Cerebrovascular<br>Laboratory, Ottawa Civic Hospital.<br><br>Assistant Professor of Neurology,<br>University of Ottawa. |
| 1988- | Clinical Associate Professor of Neurology,<br>Tufts Medical School.<br><br>Private Practice Framingham and Natick |
| 1997-1999 | President, Massachusetts Neurologic Association. |

CURRICULUM VITAE:  Joseph G. D'Alton, M.D. – Page 2

2000-                    Medical Director, Health South Acute Rehabilitation Unit,
                         Natick.


PROFESSIONAL SOCIETIES:

                         Fellow American Academy of Neurology.
                         Member Massachusetts Medical Society.
                         Member American Medical Association.
                         Member Canadian Neurological Association.
                         Fellow Stroke Council, American Heart Society.
                         Member Massachusetts Neurological Association.

BOARD CERTIFICATIONS:
                         American Board of Neurology and Psychiatry.
                         Board Certified in Neurology 1987.

HOSPITAL APPOINTMENTS:
                         Active Staff:    MetroWest Medical Center
                                          Marlboro Hospital

COMMITTEES:
1995-1999                Board Emergency Associates, MetroWest Medical Center
1994-1996                Hospital Board, MetroWest Medical Center
1993-                    Executive Board, Massachusetts Neurologic Association.
2000-2003                Member Mass Medical Society Work Group on Impaired Drivers.
2004-                    President of Medical Staff MetroWest Medical Center.


PUBLICATIONS:

1.  Grimes, D., Hassan, M. Quarrington, A., and D'Alton, J.
    Delayed onset post-hemiplegic dystonia: CT demonstration of basal Ganglia pathology.
    Neurology 32; 1033-5. 1983

2.  Norris, J.W. and D'Alton, J.G. Outcome of patients with asymptomatic
    Bruits. Cerebrovascular Diseases. Eds M. Reivich and H.I. Hurtig.
    Pgs, 63-71. Raven Press, New York. 1983.

3.  Ackerman, R.H., D'Alton, J.G., et al, Complimentary Roles of a noninvasive
    Test battery and DSA in evaluating carotid artery disease. AJNR; 757-758. 1983

4.  D'Alton, J.G. and Norris, J.W. Carotid doppler evaluation in cerebrovascular disease. Can
    Med Assoc. J 129; 1184-1189. 1983.

5.  Ackerman, R.H., Alpert, N.M., Correia, J.A., Finkelstein, S., Davis, S.M. Kelly, R.E., Donnan,
    G.A., D'Alton, J.G., and Taveras, J.M. Positron Imaging in ischemic stroke disease. Ann
    Neurol 15(suppl) S126-S130. 1984.

6.  D'Alton, J.G. The Doppler when in doubt: Emergency Medicine 16 (No. 17)
    61-73.   1984.

7.  D'Alton, J.G. Preston, D.N., Bormanis, J., Green, M.S., and Kragg, G.
    Multiple TIA's, Lupus anticoagulant and Verrucous endocarditis. Stroke. 512-514. 1985

CURRICULUM VITAE:  Joseph G. D'Alton, M.D. – Page 3

8.  Ackerman, R.H., Correia, J.A., Alpert, N.M., D'Alton, J.G., et al. Positron
    Imaging in ischemic and hemorrhagic stroke disease, The Metabolism of the human brain
    studied with positron emission tomography. Eds T. Greitz, D. Ingvar and L. Widen. Pgs. 387-
    397. Raven Press, New York. 1985

9.  D'Alton, J.G. Common Stroke Syndromes, Medicine North America 35:
    5035- 5051.  1986.

10.  D'Alton, J.G. and D'Alton, M.E.,  Epilepsy in pregnancy. Medicine North
     America 38:5671-5674. 1986.

11.  Bourque, P.R., D'Alton, J.G., Russel, N.A., et al. Congenital Lumbosacral
     Lipoma causing primary enuresis in an adult. Can Med Assoc J 135: 1007- 1008.  1986.

12.  D'Alton, J.G. and Norris, J.W. Diagnosis and management of the acute stroke
     Syndrome. In "stroke and its Rehabilitation". Eds M. Brandstater and J. Basmajin.  Pgs. 55-
     79. Williams and Wilkens, Baltimore. 1987.

13.  D'Alton, J.G., and Benoit, B., The role of ultrasound in cervical carotid
     Dissection. J. Cardiov Ultrasound. 1988.

14.  Caplan LR, Basquis G.D., Pessin MS, D'Alton J.G. et al.  Dissection of the intracranial
     vertebral artery.  Neurology 38: 868.  1988.

15.  Malva, C.L., Stuss, D.T., D'Alton, J.G. and Willmer J. Capture Errors and
     sequencing After Frontal Brain Lesions, Neuropsychologia 31:303-372.
     1993.

16.  Garmel, S.H., Guzelian, G.A., D'Alton, J.G., D'Alton, M.E.. Lumbar Disc Disease in
     Pregnancy. Obstet Gynecol 89:821-2. 1997.

17.  D'Alton, J.G., Arteriovenous Malformation and Aneurysm in Young Women. Primary Care
     Update for OB/GYNS. 5. No 2. 1-5. 1998.

18.  D'Alton, J.G. Hemicraniectomy in the treatment of Middle Cerebral Artery Infarction. In
     "Advances in Neurology, Ischemic Stroke". Eds. Barnett, Bogousslavsky and Meldrum
     Pages 379-381. Lippincott, Wilkins. 2003.


ABSTRACTS:

1.  D'Alton, J.G., and Preston, D.
    "256 HZ Vibration in the carpal tunnel syndrome"
    Can. J. Neurol Sci 7:327,  1980.

2.  D'Alton, J.G, Atack, E., and Krelina, M.
    Respiratory inhibitory apraxia: A clinical and CT study.
    Can. J . Neurol Sci. 8:194,  1984.

3.  Cusimano, M.D., D' Alton, J.G., Cooper, P., Kassel, E, and Norris, J.W.
    Risks of cerebral angiography in cerebrovascular disease.
    Can. J. Neurol Sci 9:282,  1982.

4.  D'Alton, J.G. and Norris, J.W.
    Doppler correlation of cervical bruits.
    Can. J. Neurol Sci 9:282,  1982.

CURRICULUM VITAE:  Joseph G. D'Alton, M.D. – Page 4

5.  Norris, J.W. and D'Alton, J.G.
    The outcome of patients with asymptomatic carotid bruits.
    Princeton Conference on Cerebrovascular Disease, February, 1982.

6.  D'Alton, J.G., Ackerman, R.H., Donnan, G.A., Correla, J.A., Alpert, N.M.
    and Taveras, J.M.
    Alterations in Cerebral blood flow and metabolism after transient ischemic
    attacks. Neurology. 33 (Suppl 2) 115, 1983.

7.  D'Alton, J.G., Ackerman, R.H., Donnan, G.A., Correla, J.A., Alpert, N.M.
    and Taveras, J.M.
    Positron emission tomography in stroke and tumor patients.
    American Society of Neuroimaging, Scottsdale, Arizona, February 1983.

8.  D'Alton, J.G., Ackerman, R.H. et al.
    Comparative study of positron emission tomography and electroenchaphalography in
    neurological disorders.
    Ann. Neurol. 14:144, 1983.

9.  Benoit, B.G. Russell, N.A., Grimes, J.D., Lach, B., D'Alton, J.G. and Atack, D. Spontaneous
    dissection of carotid and vertebral arteries; management considerations.
    Can. J. Neurol Sci, 11:328,  1984.

10. D'Alton, J.G., Preston, D.M., Bormanis, J., Green, M.S., and Kraag, G. Multiple TIA's Lupus,
    anticoagulant and verrucous endocarditis.
    Can. J. Neurol Sci. 11:336,  1984.

11. D'Alton, J.G. and Chapman, L.
    CNS complications of bacterial endocarditis in the CT era.
    J. Neurol. 232 (Suppl). 292, 1985.

12. Bourque, P., D'Alton, J.G., and Saginuur, R.
    Cerebellar Blastomycosis: Large abcess treated medically.
    Can. J. Neurol Sci, 13:180,  1986.

13. D'Alton, J.G. and Fornier, L.
    The role of Ultrasound in cervical carotid dissection.
    J. Cardiov. Ultrasound, 5(4) 1986

14. Caplan, L.R., Baquis, G.D., D'Alton, J.G., et al.
    Dissection of the intracranial vertebral arteries.
    Neurology 37 Suppl 132. 1987.

15. McLean, G., Guberman, A. and D'Alton, J.G.
    The onset of classic migraine in pregnancy.
    Can. J. Neurol Sci, 14:181,  1987.

16. D'Alton, J. G., Benoit, B., Russell, N.A., Skinner, C. and Simmons, N. Recurrent stenosis
    after carotid endarterectomy – Risk factor analysis.
    Can. J. Neurol, Sci, 15:191, 1988.

CURRICULUM VITAE:  Joseph G. D'Alton, M.D. – Page 5

CLINICAL RESEARCH AND CLINICAL TRIAL EXPERIENCE

| | |
|---|---|
| 1984-88 | Investigator – Canadian-American Ticlopidine Study. |
| 1986-88 | Investigator – North American  Symptomatic Carotid Endarterectomy Trial. |
| 1984-88 | Investigator – Canadian Beta-Blocker-Aspirin Trial in asymptomatic carotid stenosis |
| 1985-88 | Investigator – N.A.S.C.E.T. STUDY. |
| 1988-98 | Member Adjudication Committee N.A.S.C.E.T. |
| 1993-97 | Investigator Caprie Study. |